Filed 2/27/15  P. v. Taylor CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059227 |
| v. | (Super.Ct.No. RIF139865) |
| TANYA FELICIA TAYLOR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Becky Dugan, Judge.

Affirmed.

Martin Kassman, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General,

Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and

Respondent.

Defendant and appellant Tanya Felicia Taylor appeals from an order denying her

petition to recall her sentence under the Three Strikes Reform Act of 2012, added by

1

Proposition 36 (as approved by voters, Gen. Elec. (Nov. 6, 2012)) (the Reform Act). (Pen. Code, § 1170.126.)[1]  On appeal, defendant raises several arguments to support her claim that the trial court erred in finding her ineligible for resentencing under the Reform Act.  For the reasons explained *post,* we reject defendant's contentions and affirm the trial court's order denying defendant relief under the Reform Act.

I

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.      *Present Commitment Offenses*

On October 29, 2007, defendant entered a business called "Check Cashing" and attempted to cash a check in the amount of $150,000.  The check was made payable to "Tanya Taylor" (defendant) from the "Valley Queen Cheese Factory."  Defendant claimed the check was for a discrimination claim against a company she had worked for about six years earlier.

Police were subsequently alerted.  Riverside County Sheriff's Deputy Anthony Gannuscio responded to the call.  Defendant told him that she was trying to cash the $150,000 check awarded to her for a discrimination claim.

Investigation revealed that defendant had never worked for Valley Queen Cheese Factory and that that company had never been the subject of any discrimination litigation.

---

[1]  All future statutory references are to the Penal Code, unless otherwise stated.

[2]  The factual and procedural background is taken from this court's nonpublished opinions affirming defendant's current convictions (see *People v. Taylor* (July 31, 2009, E046225) [nonpub. opn.] and *People v. Taylor* (Mar. 8, 2011, E050082) [nonpub. opn.]).

The check in question was fraudulent, and the company had had problems with fraudulent checks.

      B.     *Prior Convictions*

Defendant's criminal history, excluding her prior strike convictions, includes offenses for misdemeanor battery (§ 243, subd. (e)) in 1997, misdemeanor false impersonation (§ 529) in 1998, and misdemeanor forgery (§ 475, subd. (a)). In each of those cases, defendant was granted probation along with a jail commitment.

From November 25, 1998 to December 20, 1998, defendant participated in a series of armed robberies; gun shots were fired during seven of them. Defendant was the getaway driver for these robberies. She was on parole for about a year and a half for these robberies when she committed the current offenses.

The details of defendant's prior strike offenses are as follows:

(1) On November 25, 1998, two men entered the Hazit Market in Perris at 6:25 p. m. One man demanded the store's money and used a gun to fire two rounds during the crime, striking the cigarette display case, cash register, and ceiling. The electronic cash register, valued at $600, was damaged.

(2) On November 25, 1998, the Super Mini Mart in Perris was robbed by two men at 6:52 p.m. One man fired a gun above one of the victim's heads; about $200 was taken.

(3) On November 29, 1998, the Meadow Brook Market on State Highway 74 was robbed by two men after one man fired a gun at the back counter, striking a wall. Approximately $2,000 was stolen. Police suspected a vehicle and a third person assisted in the suspects' escape.

3

(4) On December 1, 1998, two men entered Mel's Liquor & Check Cashing Store in Moreno Valley. One man pointed a firearm at the victim while demanding money. The store owners had their own firearm, and one chased the robbers away after a scuffle. Three shots were fired. The suspects entered a vehicle and fled the area.

(5) On December 1, 1998, two men entered the Open Liquor & Deli Store in Lake Elsinore about 7:54 p.m. with a firearm and robbed the store. One man pointed a gun at the clerk while demanding money. Approximately $500 was stolen.

(6) On December 4, 1998, Jr.'s Market in Moreno Valley was robbed at 4:30 p.m. by two men. One held a black semiautomatic handgun, which he pointed at the victims while demanding money. Approximately $2,000 was stolen.

(7) On December 5, 1998, at 6:50 p.m., two men entered Charlie Bois Liquor Store in Moreno Valley and robbed the store of about $200. During the robbery, one man pointed a semiautomatic pistol at the victim while demanding the money.

(8) On December 5, 1998, the A & M Market on State Highway 74 was robbed by two men at 7:16 p.m. During the robbery, a gun was pointed at an employee while $2,000 in cash and checks were taken by both suspects. Shots were fired at one of the employees when he tried to follow the men.

(9) December 9, 1998, a Washington Mutual Bank in Sun City was robbed. One suspect fired a shot at the ceiling; one of them kicked an employee in her head and side; and one of them "shoved a gun against" another employee's head. When a customer tried to follow the suspects as they left the bank, a shot was fired at her. The robbers stole about $3,195 in cash and fled in a car being driven by a female.

4

(10) On December 20, 1998, two men entered Country Store Liquor in Moreno Valley at 7:43 p.m. One man pointed a gun at a clerk and demanded money; he fired shots when he was given only $100.

(11) On December 20, 1998, the Car Wash & Market in Perris was robbed by two men; one wielded a firearm and pointed it at the clerk while demanding money. They stole approximately $500 in cash and $100 worth of lottery tickets.

Defendant was arrested on December 21, 1998, along with the two male suspects. She was apprehended while attempting to cash a large number of the lottery tickets stolen the previous day. During the investigation, officers discovered that defendant had used her vehicle to transport the armed robbers and was the getaway driver. Defendant shared the proceeds from the robberies with the male suspects.

On December 10, 2000, defendant was convicted of multiple serious felonies, including one count of attempted robbery (§§ 664, 211), 15 counts of robbery (§ 211), one count of assault with a firearm (§ 245, subd. (a)(2)), and three counts of assault with a semiautomatic firearm (245, subd. (b)), resulting in a sentence of 14 years in state prison.

Defendant served about six years in state prison before she was released on parole on May 12, 2006. Defendant violated parole on October 29, 2007, when she committed the instant offenses.

C.    *Procedural Background of the Current Offenses*

In a bifurcated proceeding, a jury found defendant guilty of one count of second degree burglary (§ 459) (count 1) and one count of possession of a check with the intent

5

to defraud (§ 475, subd. (c)) (count 2). Defendant subsequently admitted having sustained 20 prior strike convictions within the meaning of sections 1170.12 and 667 and one prior prison term within the meaning of section 667.5. On May 16, 2008, the Honorable Arjuna T. Saraydarian (retired) dismissed 19 of defendant's prior strikes and sentenced her to a total term of seven years in state prison.

In the first appeal, the People appealed, arguing the trial court abused its discretion in granting the motion to strike 19 of the prior strike convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). (§ 1238, subd. (a)(10).) We agreed with the People, reversed the ruling, and remanded the matter to the trial court to resentence defendant (*People v. Taylor, supra*, E046225).

The resentencing hearing was held on January 8, 2010. After reviewing the supplemental *Romero* motion and hearing argument from counsel, Judge Saraydarian declined to strike any of the 19 prior strike convictions. The court then sentenced defendant to 25 years to life on count 1; 25 years to life on count 2, stayed pursuant to section 654; and one year on the prison prior, for a total indeterminate term of 26 years to life in state prison.

Defendant subsequently appealed, arguing her 26-year-to-life term constituted cruel and unusual punishment in violation of the state and federal Constitutions. In an unpublished opinion filed on March 8, 2011, we rejected defendant's contention and affirmed the judgment (*People v. Taylor, supra*, E050082).

On November 6, 2012, the electorate passed Proposition 36, the Reform Act. Among other things, this ballot measure enacted section 1170.126, which permits persons

currently serving an indeterminate life term under the "Three Strikes" law to file a petition in the sentencing court seeking to be resentenced to a determinate term as a second striker. (§ 1170.126, subd. (f).) If the trial court determines, in its discretion, that the defendant meets the criteria of section 1170.126, subdivision (e), the court may resentence the defendant. (§ 1170.126, subds. (f), (g).)

Section 1170.126, subdivision (e), provides, as pertinent here, that a defendant is eligible for resentencing if he or she "is serving an indeterminate term of life imprisonment imposed pursuant to paragraph (2) of subdivision (e) of Section 667 or subdivision (c) of Section 1170.12 for a conviction of a felony or felonies that are not defined as serious and/or violent felonies by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7." (§ 1170.126, subd. (e)(1).)

On December 4, 2012, defendant wrote a letter to the Riverside County Public Defender's office inquiring as to how she could seek resentencing under the Reform Act. On December 14, 2012, the Honorable Becky Dugan appointed a public defender to represent defendant, notified the district attorney, and set a hearing for the following month. The public defender who had represented defendant at her trial and at her resentencing hearing was assigned to represent defendant.

In January, February, and March 2013, five hearings in defendant's absence were held in regard to defendant's petition. On May 23, 2013, the prosecutor informed the court that defendant's public defender had declared a conflict. The court thereafter appointed another public defender to represent defendant.

Judge Dugan heard defendant's petition to recall her sentence under section 1170.126 on June 27 and July 19, 2013. At that time, the court reviewed documentary evidence submitted by the parties. When filing her petition, defendant had submitted various prison records documenting her accomplishments and behavior while incarcerated. While these records showed various achievements, they also revealed numerous and repeated rule violations and infractions. In addition, defendant had submitted two institutional "laudatory chrono" reports ("chronos") documenting her behavior purportedly from two different correctional officers, praising her for her exemplary behavior and affirming that she was prepared to reenter society. These "chronos" were provided by defendant personally to defense counsel. Because these "chronos" were different from defendant's overall behavioral history while in prison, the prosecutor suspected fraud.

At the petition to recall hearing, the court also heard testimony from the two correctional officers who had allegedly authored the "chronos." Both of the officers testified that they had never issued the "chronos" on behalf of defendant; that they had never signed the "chronos"; and that the "chronos" were fake. The court also heard testimony from two inmates that had been housed with defendant. The inmates claimed that defendant had asked them to ask the correctional officer for defendant's "chronos." The court also heard testimony from defendant. Defendant claimed that she had no knowledge the "chronos" were fraudulent. She explained that she had asked the correctional officers for them; that they had arrived in her cell some time later; and that

8

she had assumed the "chronos" came from the correctional officers since she had asked the officers for them.

The court thereafter questioned defendant. During the colloquy between defendant and the court, defendant acknowledged that she did not have any positive "chronos" from correctional officers; that she had many run-ins with the officers for cussing at them and arguing with them. That colloquy also enumerated many rules violations and infractions committed by defendant including instances of mutual combats, numerous failures to report to her job assignments, failures to participate in rehabilitative programs, interferences with prison head counts, fighting, disobeying orders, and falsification of documents. Defendant had presented a forged pass from a correctional officer who had not been working on the date it was issued to see a counselor; she had also forged a document for appeal in the prison system.

Following argument from counsel, the court denied defendant's petition. The court observed that defendant's recalcitrant behavior in prison showed her immaturity and lack of insight and found that defendant's attempt to defraud the court by submitting the fake "chronos" in support of her petition demonstrated a calculated and deliberate willingness to deceive the court for her own purposes. In light of the circumstances, the court concluded that defendant continued to pose a substantial danger to public safety and that although defendant may not commit a violent crime, the court had no doubt defendant would continue her pattern of manipulative behavior thereby constituting a substantial risk of financial devastation to others.

9

Defendant timely filed an appeal on July 23, 2014.**3**

## II

## DISCUSSION

Defendant makes several arguments relating to the denial of her petition to recall her sentence. Specifically, she argues that the order denying her petition is invalid, because the judge who ruled on the petition was not the judge who had originally sentenced her and the statutory requirements for having a different judge rule on the petition were not satisfied. In the alternative, defendant contends that the trial court erred when it denied her petition, because the People failed to prove by a preponderance of the evidence resentencing her would pose an unreasonable risk of danger to public safety.

A.      *The Reform Act Generally*

The Reform Act amended sections 667 and 1170.12 and added section 1170.126; it changed the requirements for sentencing some third strike offenders. "Under the original version of the three strikes law a recidivist with two or more prior strikes who is convicted of any new felony is subject to an indeterminate life sentence. The [Reform] Act diluted the three strikes law by reserving the life sentence for cases where the current crime is a serious or violent felony or the prosecution has pled and proved an enumerated disqualifying factor. In all other cases, the recidivist will be sentenced as a second strike offender. [Citations.] The [Reform] Act also created a postconviction release proceeding

---

**3** We note that in *Teal v. Superior Court* (2014) 60 Cal.4th 595, our Supreme Court recently concluded decisions under the Reform Act are appealable orders.

whereby a prisoner who is serving an indeterminate life sentence imposed pursuant to the three strikes law for a crime that is not a serious or violent felony and who is not disqualified, may have his or her sentence recalled and be sentenced as a second strike offender unless the court determines that resentencing would pose an unreasonable risk of danger to public safety. (§ 1170.126.)" (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 167-168 (*Yearwood*).)

"Thus, there are two parts to the [Reform] Act: the first part is *prospective* only, reducing the sentence to be imposed in future three strike cases where the third strike is not a serious or violent felony [citations]; the second part is *retrospective*, providing *similar*, *but not identical*, relief for prisoners already serving third strike sentences in cases where the third strike was not a serious or violent felony (Pen. Code, § 1170.126.)" (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1292 (*Kaulick*), italics in original.) "The main difference between the prospective and the retrospective parts of the [Reform] Act is that the retrospective part of the [Reform] Act contains an 'escape valve' from resentencing for prisoners whose release poses a risk of danger." (*Id*. at p. 1293.)

It is undisputed that defendant's current commitment felony offenses of second degree burglary (§ 459) and possession of a check with the intent to defraud (§ 475, subd. (c)) are not serious or violent felonies under section 667.5, subdivision (c), or section 1192.7, subdivision (c). However, the inquiry does not end with whether or not the current convictions are a serious or violent felony. As previously noted, if the petition satisfies the criteria contained in subdivision (e) of section 1170.126, the inmate

11

shall be resentenced as a second strike offender " 'unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.' (§ 1170.126, subd. (f).) In exercising this discretion the trial court may consider the prisoner's criminal history, disciplinary record and record of rehabilitation while incarcerated and any other relevant evidence. (§ 1170.126, subd. (g).)" (*Yearwood*, *supra*, 213 Cal.App.4th at pp. 170-171.)

In approving the Reform Act, the voters found and declared that its purpose was to prevent the early release of dangerous criminals and relieve prison overcrowding by allowing low-risk, nonviolent inmates serving life sentences for petty crimes, such as shoplifting and simple drug possession, to receive twice the normal sentence instead of a life sentence. (Voter Information Guide., Gen. Elec. (Nov. 6, 2012) text of Prop. 36, § 1, subds. (3), (4) & (5), p. 105; see *People v. White* (2014) 223 Cal.App.4th 512, 522 (*White*) (review den. Apr. 30, 2014, S217030).) The electorate also mandated that the Reform Act be liberally construed to effectuate the protection of the health, safety, and welfare of the people of California. (Voter Information Guide, *supra*, text of Prop. 36, § 7, p. 110; see *White*, *supra*, at p. 522.) Accordingly, we liberally construe the provisions of the Reform Act in order to effectuate its foregoing purposes; and note that findings in voter information guides may be used to illuminate ambiguous or uncertain provisions of an enactment. (See *White*, *supra*, at p. 522; *Yearwood*, *supra*, 213 Cal.App.4th at pp.170-171.)

B.   *Failure of Petition to be Heard by the Original Sentencing Judge*

Initially, defendant argues that the denial of her petition to recall her sentence was invalid because Judge Dugan, who denied the petition, was not the judge who had originally sentenced her.  The People respond defendant forfeited this claim for failing to assert it in the court below.

Section 1170.126, subdivision (b), specifies that an inmate petitioning for resentencing must file the petition " 'before the trial court that entered the judgment of conviction in his or her case.'  The reference to 'the trial court that entered the judgment' is clearly a reference to the trial judge.  This is confirmed by a later subdivision, which uses the terms 'judge' and 'court' interchangeably, when identifying the judicial officer who must rule on the petition." (*Kaulick*, *supra*, 215 Cal.App.4th at pp. 1300-1301.)  Section 1170.126, subdivision (j) provides, " '[i]f the court that originally sentenced the defendant is not available to resentence the defendant, the presiding judge shall designate another judge to rule on the defendant's petition.' " (*Kaulick*, at p. 1301.)

"It is therefore clear that the initial sentencing judge shall rule on the prisoner's petition.  However, as with other rights, a defendant may waive the right for the petition to be considered by a particular judge.  'A valid waiver of any right, however, presupposes an actual and demonstrable knowledge of the right being waived so that the waiver is deemed knowing and intelligent.  Courts should not find a waiver by mere silence or acquiescence even when the defendant is represented by counsel.  [Citation.]' [Citation.]" (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1301, fn. omitted, quoting *People v. Poole* (1985) 168 Cal.App.3d 516, 521.)

13

Here, we find that the record impliedly shows Judge Saraydarian, the judge who had originally sentenced defendant in 2008 and resentenced her in 2010, was unavailable to resentence defendant, and therefore Judge Dugan properly ruled on defendant's petition. The record shows that Judge Saraydarian was retired at the time he had sentenced defendant in 2008 and resentenced defendant in 2010. More than six years had gone by since defendant's original sentence. When defendant filed her petition in December 2012, Judge Dugan, who was the presiding judge according to the court's minute order, acknowledged that Judge Saraydarian had originally sentenced defendant. At another hearing a month later on January 23, 2013, Judge Dugan appointed the public defender, who had originally represented defendant at trial and at the resentencing proceedings, to represent defendant on her petition, and then continued the matter to February 8, 2013, to subpoena defendant's prison records. The February 8, 2013 hearing was before the Honorable Larrie R. Brainard. At that time, the parties stipulated to a continuance and Judge Brainard continued the matter to February 25, 2013. The subsequent hearings were heard by Judge Dugan. Presumably, Judge Dugan ruled on the petition because Judge Saraydarian was unavailable.

Even if the record does not impliedly show Judge Saraydarian was unavailable, we find defendant forfeited this claim. Before directly confronting the question, we consider what we mean by the words "forfeit" and "waiver." Over the years, cases have used the words loosely to describe two related, but distinct, concepts: (1) losing a right by failing to assert it, more precisely called forfeiture; and (2) intentionally relinquishing a known right. " '[T]he terms 'waiver' and 'forfeiture' have long been used interchangeably. The

14

United States Supreme Court recently observed, however: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." [Citations.]' (*United States v. Olano* [(1993) 507 U.S. 725, 733 (123 L.Ed.2d 508, 519, 113 S.Ct. 1770)].)" (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371, quoting *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6.)

Although we agree with defendant that she did not *waive* her right to have her petition heard by Judge Saraydarian, we agree with the People that defendant *forfeited* this claim by failing to make a timely assertion of this right in the court below. Forfeiture principles are appropriately applied to most kinds of trial error, and we see no reason not to extend forfeiture in the context of this case. (See, e.g., *People v. Freeman* (2010) 47 Cal.4th 993, 999-1000 [applying forfeiture in the context of failure to seek writ review after denial of a statutory motion for judicial qualification]; *People v. Scott* (1994) 9 Cal.4th 331, 351 [waiver or forfeiture for trial court's failure to properly make or articulate sentencing choices]; *People v. Daya* (1994) 29 Cal.App.4th 697, 714 [applying forfeiture in modification of jury instructions].)

Moreover, even if we find defendant did not forfeit this claim, as explained below, *ante*, II. C., we find any error to be harmless. A "miscarriage of justice" should be declared only when the court after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) This, of course, is the familiar "reasonably

probable" standard that represents the harmless-error test generally applicable under current California law. We see no reason to extend the harmless-error test in the context of this case.

C.      *Denial of Petition*

Defendant contends the trial court erred in finding that resentencing her posed an unreasonable risk of danger, because the evidence presented by the People "fell short of justifying a finding" that she presents such a risk. This suggests that "substantial evidence" is the appropriate standard for our review. It is not. The abuse of discretion standard applies to our review, as explained below, and we structure the discussion accordingly.

Review of the trial court's ruling on the petition involves more than one issue. In part, we are called upon to determine the meaning of section 1170.126, particularly the provision that states: "*the petitioner shall be resentenced . . . unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.*" (§ 1170.126, subd. (f), italics added.) We independently determine issues of law, such as the interpretation and construction of statutory language. (*People v. Love* (2005) 132 Cal.App.4th 276, 284.) The principles of statutory interpretation apply to voter initiatives, as well as to enactments of the Legislature. (*Ramos v. Superior Court* (2007) 146 Cal.App.4th 719, 727.)

Beyond any issues of statutory interpretation, we are also called upon to review the trial court's discretionary ruling, finding that a new sentence would represent an unreasonable risk of danger to the public. "[S]ection 1170.126 entrusts the trial court

16

with discretion that may be exercised to protect the public. A court may deny a section 1170.126 petition if, after examination of the prisoner's criminal history, disciplinary record while incarcerated, and any other relevant evidence, it determines that the prisoner poses 'an unreasonable risk of danger to public safety.' (§ 1170.126, subd. (f).)" (*Yearwood*, *supra*, 213 Cal.App.4th at p. 176.)

"Where, as here, a discretionary power is statutorily vested in the trial court," we apply the abuse of discretion standard. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) Reviewing courts often apply that standard to the review of discretionary postconviction decisions. (*Romero, supra,* 13 Cal.4th at p. 531 [decision to dismiss or strike a prior conviction allegation under § 1385]; *People v. Carmony* (2004) 33 Cal.4th 367, 375 [refusal to dismiss or strike a prior conviction allegation under § 1385]; *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 974, 977 [decision whether to reduce a wobbler offense to a misdemeanor under § 17, subd. (b)].)

We conclude the abuse of discretion standard applies to the review of the trial court's section 1170.126 discretionary risk-of-danger finding. As such, we review the record to determine if the trial court abused its discretion in finding by a preponderance of the evidence that defendant "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f); *Kaulick*, *supra*, 215 Cal.App.4th at p. 1301.) When the standard of review is abuse of discretion, the reviewing court "examines the ruling of the trial court and asks whether it exceeds the bounds of reason or is arbitrary, whimsical or capricious. [Citations.] This standard involves abundant deference to the trial court's rulings." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018; *Rodrigues*, *supra*,

17

8 Cal.4th at pp. 1124-1125.) Where the record shows the trial court balanced the relevant facts and reached an impartial decision in conformity with the law, we affirm. (*People v. Zichwic* (2001) 94 Cal.App.4th 944, 961.)

Here, the trial court exercised its discretion not to resentence defendant in the manner prescribed by section 1170.126. The court balanced the relevant factors and concluded defendant continued to pose an unreasonable risk of danger to public safety. The court acknowledged that it had considered granting defendant's petition but found defendant continued to pose a danger to public safety based on the nature of her prior robberies, her disciplinary record while incarcerated, and its finding "beyond a reasonable doubt that [defendant] forged [the] chronos or had somebody forge them for her." In response to defendant's denial that she did not forge the "chronos," the court noted that there was no logical explanation for the positive "chronos"; that defendant did not deserve them; that she had not earned the positive notes in the "chronos"; that two correctional officers had testified they had not generated the "chronos" or would have never given her positive "chronos" given defendant's behavior while incarcerated; and that the "chronos" were sent directly by defendant to her former public defender. The court also noted defendant's prior robberies were violent, armed robberies; that witnesses had actually seen defendant participate in them, not just as a driver; and that defendant had continued to commit crimes while in prison "in the sense of creating documents out of cold cloth . . . ." As the court pointed out, defendant had led a life of crime and had continued to lead a life of crime while incarcerated to serve her purpose. The current

18

convictions were not serious or violent, but the court expressed concern that if defendant "will commit an offense in custody for her needs, what on earth will she do out?"

The People met their burden to convince the trial court that defendant continued to pose an unreasonable risk of danger to public safety by a preponderance of the evidence. (Evid. Code, § 115.) No more was required.

Defendant's prior robbery convictions were violent; defendant had committed numerous rules violations and infractions; and defendant had forged prison documents to serve her purpose. Defendant's actions indeed demonstrated immaturity, lack of insight, and a lack of rehabilitation or reformation. Defendant's strike offenses involved weapons and threats of violence in the commission of a number of robberies. Defendant failed at each opportunity in the past to learn from her mistakes. After her grants of probation, time spent in jail and prison, and release from prison custody, she soon reoffended in much the same way, by trying to cash a forged check in the amount of $150,000. And, while in custody on the present commitment offenses, although defendant had a few positive achievements, defendant still acted out, cursed at staff, failed to report as assigned, failed to participate in rehabilitative programs, interfered with prison head counts, disobeyed orders, fought with other inmates, and falsified documents.

Defendant displayed remarkably little understanding of the consequences of her actions. She had done little or nothing to gain perspective, to improve herself, to make amends for the wrongs she had done, or even to express minimal understanding of the harms she had caused. The record here was replete with many different kinds of incidents, both in defendant's criminal record and in her prison correctional files, which

19

indicated that defendant continued to pose an ongoing risk to public safety were she to be released. She had achieved very little in the way of documented efforts at rehabilitation and she had continued to minimize her own misconduct. It simply cannot be said that the trial court's determination that defendant remained an unreasonable risk to public safety was an arbitrary, whimsical, or capricious conclusion. (See, e.g., *People v. Nocelotl* (2012) 211 Cal.App.4th 1091, 1097.)

Defendant appears to argue that the phrase "unreasonable risk of danger to public safety" in the Reform Act was not intended for inmates like her "whose recent history suggests that they might forge hall passes, inflate their resumes with invested praise from supervisors, or even present phony checks for cashing," but for inmates who are violent offenders. We reject this contention.

While the voter information guide or the ballot pamphlet for the Reform Act notes the intent of the Reform Act was to keep violent offenders off the streets and to release nonviolent inmates to save taxpayer money (see Voter Information Guide, *supra*, text of Prop. 36, § 1, subds. (3), (4) & (5), p. 105), the Reform Act clearly gives the trial court discretion to determine whether resentencing would pose an "unreasonable risk of danger to public safety." The Reform Act clearly had a dual purpose—that of ameliorating unduly harsh third strike sentences and protecting the public. The Reform Act does not define the phrase " 'unreasonable risk of danger to public safety' . . . . The word 'unreasonable' ' "is a widely used and well understood word and clearly so when juxtaposed" ' with 'risk of danger.' (. . . *People v. Morgan* (2007) 42 Cal.4th 593, 606 . . . [' "As the Supreme Court stated in *Go-Bart Importing Co. v. United*

20

*States* (1931) 282 U.S. 344, 357 [75 L.Ed. 374, 51 S.Ct. 153], 'There is no formula for the determination of reasonableness.' Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." '].)" (*People v. Flores* (2014) 227 Cal.App.4th 1070, 1075 (*Flores*) [appellate court recently rejected inmate's claim that the phrase "unreasonable risk" is not impermissibly vague].)

"Surely a superior court judge is capable of exercising discretion, justly applying the public safety exception, and determining whether a lesser sentence would pose an unreasonable risk of harm to the public safety. (See, e.g., *People v. Espinoza* (2014) 226 Cal.App.4th 635 [grant of relief where a lesser sentence would not impose an unreasonable risk of harm to the public safety].) This is one of those instances where the law is supposed to have what is referred to by Chief Justice Rehnquist as ' "play in the joints." ' (*Locke v. Davey* (2004) 540 U.S. 712, 718, 158 L.Ed.2d 1, 124 S.Ct. 1307.) 'This is a descriptive way of saying that the law is flexible enough for the . . . trial court to achieve a just result depending on the facts, law, and equities of the situation.' [Citation.]" (*Flores*, *supra*, 227 Cal.App.4th at p. 1075, fn. omitted.)

There is likely some level of trauma or victimization in the commission of almost any type of offense. However, it is no less true that the facts applicable to some criminal offenses will show them to be less traumatizing, and the offender perhaps less dangerous to public safety than the facts in other cases. There is no blanket determination that all offenders who commit property crimes or fraud crimes are less dangerous than other offenders. Regardless of whether or not defendant's actions while in custody were

21

violent or nonviolent, she had demonstrated a lack of ability to conform her conduct to society's standards and continued to pose an unreasonable risk to public safety should she be released from prison. The trial court was well aware of the positive factors defendant cites on appeal, but determined that based on a weighing of all the factors, including the negative ones we have recounted that demonstrate dangerousness, the court reasonably believed defendant presented an unreasonable risk of danger to public safety. Thus, defendant has not shown the trial court's exercise of its discretion was an abuse of that discretion.

D.    *Application of Proposition 47*

In a supplemental brief, defendant argues that this court should apply the definition of the phrase "unreasonable risk of danger to public safety" as defined in section 1170.18, subdivision (c), to the phrase as it appears in section 1170.126, subdivision (f).[4] Defendant also argues that section 1170.18 applies retroactively and that under the definition of "unreasonable risk of danger to public safety" as defined in section 1170.18, subdivision (c), and as applied in section 1170.126, subdivision (f), resentencing defendant under section 1170.126 would not pose an unreasonable risk of danger to public safety. We find that Proposition 47 is not retroactive, and therefore we need not decide defendant's remaining contentions.

---

[4] Section 1170.18 was enacted by the voters at the November 4, 2014 general election as part of the Safe Neighborhoods and Schools Act, otherwise known as and referred to herein as Proposition 47.

22

Proposition 47 created a new resentencing provision, section 1170.18, under which "[a] person currently serving a sentence for a conviction, whether by trial or plea, of a felony or felonies who would have been guilty of a misdemeanor under the act that added this section ('this act') had this act been in effect at the time of the offense may petition for a recall of sentence . . ." and request resentencing. (§ 1170.18, subd. (a).) Under that provision, an eligible defendant shall be resentenced to a misdemeanor "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).) Proposition 47 also provides that, "*As used throughout this Code*, 'unreasonable risk of danger to public safety' means an *unreasonable risk that the petitioner will commit a new violent felony* within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c), italics added.)

"No part of [the Penal Code] is retroactive, unless expressly so declared." (§ 3.) The California Supreme Court "ha[s] described section 3, and its identical counterparts in other codes (e.g., Civ. Code, § 3; Code Civ. Proc., § 3), as codifying 'the time-honored principle . . . that in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' " (*People v. Brown* (2012) 54 Cal.4th 314, 319 (*Brown*).) "In interpreting a voter initiative, we apply the same principles that govern our construction of a statute." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006.)

Proposition 47 is silent as to its retroactive application to proceedings under the Reform Act. Similarly, the analysis of Proposition 47 by the legislative analyst, the arguments in favor of Proposition 47, and the arguments against Proposition 47 are silent as to the retroactive application to proceedings under the Reform Act. (Voter Information Guide, Gen. Elec. (Nov. 4, 2014), text of Prop. 47 & analysis by Legis. Analyst, pp. 34-39.) Thus, there is "no clear and unavoidable implication" of retroactivity that "arises from the relevant extrinsic sources." (*Brown*, *supra*, 54 Cal.4th at p. 320.) As noted earlier, this section and subdivision were enacted on November 4, 2014, when California voters passed Proposition 47, long past the time of defendant's resentencing hearing. Unless the legislation was designed or intended to apply retroactively, the definition in section 1170.18, subdivision (c), cannot apply to defendant.

Nevertheless, defendant contends that the principle enunciated in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) compels a finding of retroactivity here. As we explain, *Estrada* does not apply.

In *Estrada*, our Supreme Court stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada*, *supra*, 63 Cal.2d at p. 745.) This includes "acts committed before its passage provided the judgment

24

convicting the defendant of the act is not final." (*Ibid*.) Accordingly, a statute lessening punishment is presumed to apply to all cases not yet reduced to final judgment on the statute's effective date, unless there is a "saving clause" providing for prospective application. (*Id*. at pp. 744-745, 747-748.)

Contrary to defendant's assertion, *Estrada* does not apply here because applying the definition of "unreasonable risk to public safety" in Proposition 47 to petitions for resentencing under the Reform Act does not reduce punishment for a particular crime. Rather, it changes the lens through which the dangerousness determinations under the Reform Act are made. Using the words of *Brown*, that "does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent." (*Brown*, *supra*, 54 Cal.4th at p. 325.) As the California Supreme Court explained in *Brown*, "*Estrada* is . . . properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, supra, 54 Cal.4th at p. 324.)

*Brown* addressed the 2010 amendment to former section 4019 that increased the rate at which eligible prisoners could earn conduct credit for time spent in local custody. (*Brown*, *supra*, 54 Cal.4th at pp. 317-318.) In passing this amendment, the Legislature did not "express[ly] declar[e] that increased conduct credits [we]re to be awarded retroactively, and [there was] no clear and unavoidable implication to that effect . . . from

25

the relevant extrinsic sources, i.e., the legislative history." (*Id*. at p. 320.) Thus, the California Supreme Court applied the "default rule" in section 3 that " 'No part of [the Penal Code] is retroactive, unless expressly so declared.' " (*Brown*, at pp. 319-320.) In doing so, our Supreme Court rejected the defendant's argument that *Estrada* "should be understood to apply more broadly to any statute that reduces punishment in any manner, and that to increase credits is to reduce punishment." (*Brown*, at p. 325.) The court rejected defendant's argument for two reasons: "First, the argument would expand the *Estrada* rule's scope of operation in precisely the manner we forbade . . . . Second, the argument does not in any event represent a logical extension of *Estrada*'s reasoning. We do not take issue with the proposition that a convicted prisoner who is released a day early is punished a day less. But, as we have explained, the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the penalty for a particular crime" ' [citation] because such a law supports the inference that the Legislature would prefer to impose the new, shorter penalty rather than to ' "satisfy a desire for vengeance" ' [citation.]. The same logic does not inform our understanding of a law that rewards good behavior in prison." (*Brown*, at p. 325, italics omitted.)

Expanding the *Estrada* rule's scope of operation here to the definition of "unreasonable risk to public safety" in Proposition 47 in a petition for resentencing under the Reform Act would conflict with section 3's "default rule of prospective operation" (*Brown, supra*, 54 Cal.4th at p. 324) where there is no evidence in Proposition 47 that this definition was to apply retrospectively to petitions for resentencing under the Reform Act and would be improper given that the definition of "unreasonable risk to public safety" in

26

Proposition 47 does not reduce punishment for a particular crime. For these reasons, we hold that the definition of "unreasonable risk to public safety" in Proposition 47 does not apply retroactively to a defendant such as the one here whose petition for resentencing under the Reform Act was decided before the effective date of Proposition 47.[5]

III

DISPOSITION

The order denying defendant's petition for a recall of her life sentence and for resentencing as a second strike offender under the Reform Act is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.

---

[5] We note that on February 18, 2015, the California Supreme Court granted review of *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676, which held that the definition of "unreasonable risk of danger to public safety" from Proposition 47 does not apply retroactively to petitions for recall and resentencing under the Reform Act. On this same date, the California Supreme Court also granted review of *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted February 18, 2015, S223825, which held that the literal meaning of section 1170.18, subdivision (c), as added by Proposition 47 does not comport with the purpose of the Reform Act, and applying it to resentencing proceedings under the Reform Act would frustrate, rather than promote, that purpose and the intent of the electorate in enacting both initiative measures.